UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
REFAAT KHALIFA; SAMAH ALI; Z.K, a
minor by her parent and natural guardian
REFAAT KHALIFA; and M.K., a minor by
her parent and natural guardian REFAAT
KHALIFA,

              Plaintiffs,

  -against-

THE CITY OF NEW YORK; and Police
Officer THOMAS SMITH, Tax No. 935767,

             Defendants.
-------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 15-CV-06611 (FB) (ST)

Appearances:
*For the Plaintiffs*:
KIM E. RICHMAN
The Richman Law Group
81 Prospect Street
Brooklyn, NY 11201

*For the Defendants*:
ZACHARY W. CARTER
New York City Law Department
100 Church Street
New York, NY 10007
By: MATTHEW E. STEIN

**BLOCK, Senior District Judge:**

      Pending before the Court is defendant New York Police Department Officer Thomas Smith's ("Smith's") motion for partial summary judgment. The parties have stipulated to the dismissal of state-law claims against all defendants, as well as to the dismissal of all claims against New York City. *See* Dkt. No. 50. The remaining claims, all brought solely against Smith under 42 U.S.C. § 1983, are for false arrest, use of excessive force, denial of equal protection, and denial of familial

1

association. *See* Dkt. No. 40. Smith moves for summary judgment on all of these remaining claims except for use of excessive force. The Court grants the motion in part and denies in part.

## BACKGROUND

With the exception of a short medical record and a photograph—the authenticities of which are undisputed by either party (at least for the purposes of this motion)—the facts before the Court are drawn entirely from deposition testimony.

The parties agree that on August 2, 2014, plaintiff Refaat Khalifa ("Khalifa") was driving in Brooklyn with his two minor daughters, plaintiffs Z.K. and M.K. Pl. 56.1, Dkt. No. 58 ¶ 5. At some point, apparently distracted by Z.K., Khalifa crashed his car into a gate near an intersection. ¶ 9. Neither Khalifa nor his daughters were injured, but the car was totaled. ¶¶ 10, 12. Khalifa called his wife, Samah Ali ("Ali"), who arrived shortly thereafter. ¶¶ 13, 16. Two ambulances also shortly arrived, as did Smith. ¶¶ 14, 19. The ambulance workers ("EMTs") asked Khalifa if he or his daughters wanted to go to a hospital, but he initially refused. ¶ 15. Ali, however, insisted that Z.K. and M.K. go to the hospital. At first, the EMTs would not let Ali or Khalifa accompany their daughters to the hospital, but, eventually, Ali was allowed to join them. ¶¶ 37, 43.

As to Khalifa, the parties also agree that, in speaking with the EMTs, he told

them something about having "white spots" on his brain. ¶ 28. Their stories quickly diverge, however, as to Khalifa's interactions with Smith. The plaintiffs contend that Khalifa, while understandably distraught, coherently told Smith and the EMTs that he did not want to go to the hospital. When Ali insisted that Z.K. and M.K. go, however, he agreed to go as well, but wanted to accompany his daughters in their ambulance. *See* ¶¶ 20, 26. Meanwhile, Smith contends that Khalifa was making incoherent "yelps and clicks" in response to Smith's requests to produce his license and insurance information, and was generally speaking in "gibberish". ¶¶ 20, 21. Smith also contends that Khalifa completely refused to go to the hospital, and also refused to sign a form to indicate that he was refusing medical attention. ¶ 22.[1]

The parties do agree that not long into his interaction with Khalifa, Smith punched and headbutted Khalifa, causing him to fall to the ground and injure his legs. Smith twisted Khalifa's arms, placed him in handcuffs, and physically pushed

---

[1] Smith also contends that in his deposition testimony, Khalifa conceded that he "was not thinking clearly because he was only focused on the well-being and safety of his daughters." Pl. 56.1 ¶ 17 (citing Stein Decl., Dkt. No. 54, Ex. A, ("Khalifa Dep.") at 73–74). The parties claim that this mischaracterizes Khalifa's testimony. He was explaining that one reason he did not want to go to the hospital was that he did not want to leave his daughters alone. *See* Khalifa Dep. At 72:2–3 ("If I go by myself, how I'm going to leave them alone?"). When, in the deposition, counsel pointed out that "had [you] gone to the hospital, your daughters would have been with your wife, right?", *id.* at 73:2–4, Khalifa explained that "I didn't think the right way." *Id.* at 73:21. To the extent that there is any ambiguity in this testimony, the Court must resolve it in the plaintiffs' favor because they are the non-moving parties. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

him into the second ambulance (as opposed to the one that Z.K. and M.K. were to be driven in). ¶¶ 29–32. During this process, the parties also agree that Smith called Khalifa a "criminal" and accused him of being drunk and on drugs and of "not acting normal." Ali (and possibly the children) saw the altercation, ¶ 40, and Ali told Smith that, as a Muslim, Khalifa does not drink. ¶ 41. The parties agree that Smith responded by calling all Muslims terrorists and proceeding with the arrest. ¶ 42. Finally, the parties agree that both ambulances drove to Lutheran Hospital, where Khalifa remained in handcuffs for several hours, and where in response to protests from Ali and Z.K., Smith again said that all Muslims are terrorists as well as drug addicts. ¶ 46. Ali took a picture of Khalifa's injuries at the hospital, which generally showed injuries on his knees and legs. ¶ 47; *see* Dkt. No. 54 Ex. G.

## DISCUSSION

"Summary judgment is properly granted when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor." *Id.* The non-moving party must "set[] forth specific facts showing that there exists a genuine issue of material fact." *Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996). In doing so, the party "cannot rely on the allegations in his or her pleadings, conclusory statements,

4

or on 'mere assertions that affidavits supporting the motion are not credible.'" *Culleton v. Honeywell Int'l, Inc.*, 257 F. Supp. 3d 333, 340 (E.D.N.Y. 2017).

A. **False Arrest**

With respect to Khalifa's false arrest claim,[2] Smith raises two defenses: that there was probable cause to arrest Khalifa, or, in the alternative, that there was arguable probable cause, thus entitling him to qualified immunity.

### 1. *Probable Cause*

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "An officer has probable cause to arrest when in possession of facts sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense." *Riccuiti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The reasonableness inquiry is purely objective, and the officer's subjective reasons are irrelevant for the probable cause inquiry. *Id.* at 153–

---

[2] As Smith notes, the false arrest claim is only properly raised by Khalifa, as there are no allegations in the complaint that Ali, Z.K., or M.K. were arrested.

54.

Here, Smith claims that there was probable cause to arrest Khalifa because his behavior suggested that he may have caused an accident under the influence of drugs or alcohol, which would obviously be an offense. Alternatively, Smith points to New York Mental Hygiene Law § 9.41, which authorizes a police officer to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others."

There are significant disputes of fact underlying the probable cause inquiry. Smith describes a scene with a troubled or possibly intoxicated man who had just caused a serious traffic accident. Smith contends that Khalifa spoke in "gibberish," was uncooperative, and refused to (or possibly did not understand that he had to) sign a waiver form to refuse treatment. This set of facts would undoubtedly give rise to a reasonable conclusion that Khalifa had either just committed a crime (driving under the influence) or was "mentally ill and [was] conducting himself . . . in a manner which is likely to result in serious harm to [himself] or others," including potentially his minor daughters.

In contrast, the plaintiffs allege that Khalifa spoke in plain English, coherently explained that he did not wish to go to the hospital, and later changed his mind and only asked that he be transported alongside his daughters. In the plaintiffs' narrative, Khalifa was not given the choice to sign a form to refuse medical attention. Rather,

6

Khalifa testified that Smith insisted that he had to go to the hospital, and when Khalifa refused, he was immediately punched and placed under arrest. Moreover, the plaintiffs point to undisputed evidence that Ali told Smith that Khalifa could not be intoxicated because he was an observant Muslim. Smith does not dispute that he responded to this information only with an Islamophobic comment. This narrative would undoubtedly *not* support a finding of probable cause. Given that the two conflicting narratives are both drawn from deposition testimony, granting summary judgment would amount to making a credibility determination, which the Court may not do at the summary judgment stage.

In further support of his version of the facts, Smith points to the Prehospital Care Report Summary, Dkt. No. 54 Ex. F ("PCRS"), which includes the handwritten notation "REFUSED TO SIGN" underneath a waiver intended for individuals refusing medical attention. *See* PCRS at 3. Refusal to sign the waiver, however, is consistent with the plaintiffs' narrative, in which Khalifa ultimately did *not* refuse medical attention and merely asked to go to the hospital in the same ambulance as his daughters. In addition, the plaintiffs point to text above the signature boxes, which says "Refused to Sign: No." The internal inconsistency of this document calls for a fact-based determination that is inappropriate at the summary judgment stage.

Finally, Smith points to Khalifa's medical history and statements to the EMTs about his neurological condition. But Smith points to nothing in the record

7

suggesting that at the time of the arrest, he knew about this condition. The existence of probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*." *Devenpeck*, 542 U.S. at 152 (emphasis added). Not only does Smith not allege that he was present when Khalifa told the EMTs about his "white spots," an inference that he was aware of Khalifa's statement is inconsistent with his narrative about Khalifa speaking in "gibberish."

Therefore, there exists a genuine dispute of material fact whether Smith had probable cause to arrest Khalifa.

### 2. *Qualified Immunity*

Smith argues in the alternative that he is entitled to qualified immunity because there was at least "arguable probable cause" to arrest Khalifa. "Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65, 69 (2d Cir. 2018). The existence of arguable probable cause supports a qualified immunity defense. *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017). "Arguable probable cause exists 'if officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Gonzalez*, 728 F.3d at 157).

"Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (alterations omitted) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007)). "If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court. 'If there is such a dispute,' however, 'the factual questions must be resolved by the factfinder.'" *Zellner*, 494 F.3d at 368 (alterations and internal citations omitted) (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)).

Here, the dispute as to the historical facts defeats Smith's qualified immunity defense, at least at this stage of the proceeding. Under the plaintiffs' narrative of events, no reasonable officer would have arrested Khalifa, and Smith does not seriously argue otherwise. Instead, in arguing for qualified immunity, Smith explains that "he was placed in a very challenging position that required him to make a very difficult decision." Smith Br., Dkt. No. 55 at 11. In describing that challenging position, however, he again recounts the disputed portions of his narrative, including an inability to communicate with Khalifa and Khalifa's refusal to sign the PCRS. These are disputed historical facts that must be resolved by the jury at trial, not by the Court on a summary judgment motion.

Because there are genuine disputes of material fact as to whether Smith had

either probable cause or arguable probable cause to arrest Khalifa, the Court denies summary judgment on Khalifa's false arrest claim.

B.  **Denial of Equal Protection**

To prevail on an equal protection claim, the plaintiff must prove: that (1) he or she, "compared with others similarly situated, was selectively treated" and (2) "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Brown v. City of Syracuse*, 673 F.3d 141, 151–52 (2d Cir. 2012) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). In evaluating equal protection claims, the Court may examine whether a proffered non-discriminatory consideration was pretextual. *See Coward v. Town & Vill. Of Harrison*, 665 F. Supp. 2d 281, 303 (S.D.N.Y. 2009) ("When the issue is whether or not an impermissible consideration motivated the challenged action, pretext analysis employs the familiar three-step approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." (alterations omitted) (quoting *Howard v. Senkowski*, 986 F.2d 24, 27 (2d Cir. 1993)).

Smith argues that Khalifa was not arrested because of his religion but because Smith believed him to be on drugs. First, this is a disputed issue of fact, and the Court may not resolve the issue at the summary judgment stage. Second, under the plaintiffs' version of the facts, Smith's belief that Khalifa was on drugs was either

10

obviously pretextual or sincerely driven by a discriminatory belief. Thus, Khalifa has demonstrated a genuine dispute of fact as to whether he was selectively treated based on his religion.³

As for the remaining plaintiffs' equal protection claims, however, Smith's motion is granted. Ali, Z.K., and M.K. were not arrested, nor, as discussed below, can they prevail on their familial association claim. Their only claim for equal protection rests on Smith's comments about Muslims which, while deplorable, amount only to verbal harassment. On its own, verbal harassment, including harassment that contains racial epithets, does not "amount to a constitutional deprivation." *Ali v. Connick*, 136 F. Supp. 3d 270, 276 (E.D.N.Y. 2015) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)); *see also Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999) (holding that although "the use of an epithet is . . . strong evidence that a comment or action is racially motivated," in situations "[w]here the conduct at issue consists solely of speech, there is no equal protection violation.").

Thus, the Court grants summary judgment as to Ali's, Z.K.'s, and M.K.'s equal protection claims, but denies it as to Khalifa's equal protection claim.

---

³ Smith also points to the undisputed fact that Khalifa did not himself hear Smith's racial epithets (unlike Ali, who did). *See* Pl. 56.1 ¶ 50. But Smith does not point to any authority suggesting that an equal protection claim is viable only when a plaintiff is contemporaneously aware of the defendant's discriminatory motive, nor is the Court aware of any such requirement.

C. **Denial of Familial Association**

It is well settled "that the Constitution in at least some circumstances protects familial relationships from unwarranted government interference." *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002). "Although clearly recognized in a general way by the Supreme Court and in scholarly writings, all of its boundaries have not been fixed." *Id.* at 133. "Nonetheless, government action violates the right only if it is 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Morales v. City of New York*, 59 F. Supp. 3d 573, 579 (S.D.N.Y. 2014) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999)).

Here, the plaintiffs' claim for deprivation of familial association rests on the fact that Khalifa was forcibly separated from the rest of his family when he was transported to the hospital in a different ambulance from his daughters and wife. The plaintiffs discuss recent controversy regarding the separation of families in the immigration context, *see Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (concerning entry restrictions on individuals with "close familial relationships" with persons in the United States); *Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp. 3d 1149 (S.D. Cal. 2018) (concerning separation of migrant families in immigration detention), and recount Smith's Islamophobic comments, presumably by way of an analogy.

Smith, meanwhile, points out that Ali was not separated from her children. Although that alone does not defeat the familial association argument (Khalifa was still separated from his wife and children, and vice-versa), the facts of this case simply do not suffice for a familial association claim. Although the family was briefly separated, they were driven to the same hospital and quickly reunited. Moreover, there is nothing in the facts to indicate that Smith specifically aimed to separate the family. *Cf. McGarr v. City of Peekskill*, 975 F. Supp. 2d 377, 391 (S.D.N.Y. 2013) (noting that the government officials did not "specifically target[] the familial relationship, qua the familial relationship" in their alleged misconduct). In short, with respect to the separate ambulance transportation, the conduct in this case was simply not "so shocking, arbitrary, and egregious" as to make out a familial association claim.

## CONCLUSION

Smith's motion for partial summary judgment is granted as to (1) the equal protection claims as alleged by Ali, Z.K., and M.K.; and (2) the familial association claims as alleged by all plaintiffs. His motion for partial summary judgment is denied as to (1) the false arrest claim (which was alleged by Khalifa only); and

(2) the equal protection claim as alleged by Khalifa.

**SO ORDERED.**

/S/ **Frederic Block**
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
April 3, 2019